[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Procedure
By complaint dated June 8, 1999, the plaintiff father, Stacey Lawson, CT Page 8299 commenced this action seeking custody and visitation with the minor child Stacia M. Lawson. Interim orders for visitation were made by the court on August 11, 1999, based on an agreement of the parties. On October 21, 1999, the mother filed a Motion for Modification requesting sole custody of the child. On November 23, 1999, the father filed a Motion for contempt alleging that the mother was not permitting him to visit with the child in violation of the August 11, 1999 agreement and order. On December 1, 1999, the parties entered an agreement which set forth a visitation schedule for the father but prohibited the father's significant other from being alone with the child. The parties also agreed that the mother would consult with the father on all issues involving the child's health, education and welfare.
On April 26, 2000, the mother was ordered not to remove the child from Connecticut and a referral to Family Relations was ordered then vacated.
On August 15, 2000, the mother filed a Motion for Modification of Visitation, alleging that she was moving to the state of Florida. This Motion for Modification was denied on January 31, 2001. On October 4, 2000, the case was again referred to family relations for a Custody Study and the child was appointed an attorney. On October 13, 2000, the court reaffirmed the order that the child remain in Connecticut but allowed her to visit in Florida with her mother. On November 15, 2000, the father amended his complaint seeking joint legal custody of the minor child with primary residence with the father and reasonable rights of visitation to the mother. On December 14, 2000, the mother filed a cross complaint seeking sole legal custody of the child and primary residence with the mother.
Discussion on Relocation
The plaintiff mother has moved for sole custody based on her wish to relocate to the state of Florida with the minor child. The court's authority to modify a custody decree is conferred by statute which requires that the court's decision must be guided by the best interests of the child. Connecticut General Statutes, Sec 46b-56.
Although this case raises many of the issues raised in the landmark case of Ireland v. Ireland, 246 Conn. 413 (1998), it presents a different factual pattern because the parties were never married and no custody order has ever been made with respect to the child. Accordingly, the burden shifting requirements set forth in Ireland are not applicable to this case.[1]
 Findings of Fact
CT Page 8300
The court heard testimony from the plaintiff father, the defendant mother, Madrika Lawson (the plaintiff's sister), Cheryl Ferguson (the mother of Stacia's stepfather's other children), Celeste Seneshal (Family Relations), Lisa Lawson (the plaintiff's wife), Ladonn Barrows (the defendant's friend), David Hendrix (the defendant's step-father), and Attorney Nancy Thompson (the child's GAL). This testimony as well as exhibits, established the following facts.
The parties in this case never married. They knew each other in high school and began a relationship in 1992. Stacia was born on March 17, 1994. She resided in the home with her half-sibling Jermaine. The plaintiff-father was like a father figure to Jermaine during that period, coaching him in Little League and basketball. The child called him "dad."
In the early years of Stacia's life, the father's family had access to the child but the father was only permitted to see the child through other family members. This was the case particularly when the mother and father had a disagreement. Paternal family members, including aunts and grandparents, included the child in family vacations, had her over for weekends, and spent a significant amount of time with her. They bought the child clothes and were permitted unfettered access to the child by the mother as long as they agreed not to give the father any contact with the child.
In July of 1999, the mother got into an argument on the telephone with Lisa, the father's fiancee, questioning why she (the mother) had not been invited to the father's wedding. After that conversation, the father and his family were not permitted to see the child and the child was not permitted to attend her father's wedding. The mother married Nygil in 1999 after the father filed a Motion for Visitation. Both she and her husband had steady employment from that time until Nygil left the state in November 2000.
After the court ordered that the child not be removed from Connecticut in April 2000, and while motions were pending with respect to custody and relocation issues over the child, the mother put her house, located only a few blocks from the father, on the real estate market in August 2000 and sold it in the fall of 2000. Before Thanksgiving 2000, her husband Nygil quit his job and moved down to Florida where the mother and her husband then purchased a new home in December 2000. In December of 2000, the mother sent her 14 year old son Jermaine to live with Nygil in Florida where he was immediately enrolled in school. The mother and the child Stacia have since lived with the maternal grandmother here in Connecticut. Nygil is currently doing work in Florida similar to that which he did here in Connecticut: driving and delivering newspapers. CT Page 8301 Since December 2000, the maternal uncle and maternal great-grandmother have moved into the Florida home.
The child loves her mother and her father and is bonded to each of them. She also has close ties to her step-father Nygil, her step-mother Lisa, her brother Jermaine who now lives in Florida, and to her step-sister Janelli and baby half-sister Alexis, who live with the father and his wife Lisa here in Connecticut. She is also close to both her paternal and maternal extended families, including grandparents, who reside here in Hartford or surrounding areas. The child is very comfortable on her visits with her father and his family and she only gets upset when the mother calls to tell her that she has "bought her something" which the child wants to see immediately. The child has other maternal relatives in Florida but she has never met them.
The father is a basketball coach and hall monitor at Bloomfield High School. He was very frank in his testimony about his arrest for marijuana possession in the early 1990's and his arrest because of mistaken identity on charges which were ultimately dismissed. He was also quite frank in his testimony with respect to his and the mother's use of marijuana "3 or 4 years ago" but also indicated that his present job requires random drug testing.
The father's wife, Lisa, works for the Board of Education Services for the Blind. She and the father live in a three bedroom house with her 14 year old daughter Janelli and their three year old daughter Alexis, who has some special medical needs. Lisa's sister lives on the second floor and her mother lives in a basement efficiency apartment. Their property adjoins Kannelly School which Stacia currently attends.
The mother's husband, Nygil, is the father of two other children. Since he relocated to Florida in November 2000, he has paid no regular child support (except for $100 that the children received at Christmas from Nygil's mother and $200 from a tax return in February) for the benefit of these children and has provided no forwarding address to their mother or to the state of Connecticut Child Support Enforcement Division. As Ms. Ferguson testified, he loves his children but just doesn't see them.
Celeste Senechal testified that her interview with Nygil left her with the impression that he supports his children and that with the move to Florida, he had made great financial strides. She also testified that while she didn't know how the child would benefit by the move to Florida itself, the child would benefit by being close to her mother and brother. She favored relocation of the child to Florida with visitation by the father. CT Page 8302
It is clear to the court that while the mother has moved on in her life, she has had tremendous difficulty with the father moving on in his. The court finds the paternal aunt Madrika's testimony to be quite credible. This testimony established that the father was denied access to the child when he began seeing Lisa because she was "a Puerto Rican." It also established that the paternal grandmother provided daycare for the child, that the paternal family provided clothing and a coat every year to the child and that the father has provided a high quality of care to the child including baths every night during her visits with him. Madrika also testified that vacations were planned on at least 2 occasions with the child and the paternal extended family and her father (to North Carolina and to a Virginia Beach family reunion) but that the mother either refused to allow the child to go or pulled her from the car at the last minute.
The mother claims that her reasons for relocating are threefold: first, after she researched on the internet, she concluded that the state of Florida has better schools, particularly for her son Jermaine who has special needs; second, because it is a wonderful opportunity for her to work in communications at her uncle's newspaper; and third, because it is a slower pace and better life for her and her children. At the same time, she acknowledged in her testimony that the child was flourishing at Kennelly School here in Connecticut. She also claimed to have signed an employment contract with her Uncle Cherry for a $35,000.00 per year administrative assistant job in communications but she did not offer any documentary evidence to support this. She conceded that she has not looked for jobs in communication in the Hartford area. She testified that in Connecticut, she has earned as much as $45,000.00 per year at the Message Center and as little as $20-25,000.00 per year as a community organizer for HARC. She is presently doing temporary work.
The court is convinced that the both parents love this child and have provided her with appropriate care over the course of her lifetime. By all accounts, Stacia is a well-behaved and sweet child. At the same time, the court is also convinced that the father is much more likely than the mother to permit and encourage the child to have a healthy relationship with the other parent and extended family members. This is evidenced by the numerous instances cited in testimony of the mother's direct undermining of the father's time with the child. These instances include her withholding the child from the father during periods of anger, preventing the child from vacationing with her father and his family for no cause, leaving the child with the maternal grandmother for four weeks in February 2001 while the mother went to Florida and did not notify the father or allow the child to be in his care during that time, and not permitting the child to attend her father's wedding to Lisa, even after the child's dress and shoes were bought. They also include the mother's CT Page 8303 withholding visitation in the early years when the father would complain about the child's unkempt appearance, the mother's threats to call the police when the father tried to pursue visitation, her allowing the paternal family's visitation with the child conditioned on their preventing contact with the father and the mother's questioning of the child upon her return from visits with her father.
The court takes credence in the guardian ad litem's testimony in which she indicated that she had met on several occasions with the various family members and the child, that the child appeared coached when interviewed with the mother, but that she clearly loves both parents and stepparents. She recommended that Stacia not be permitted to relocate to Florida with her mother and recommended that the father be given primary residence of the child. She based her opinion on the mother's apparent desire to minimize Stacia's relationship with her father and his family, her opinion that the mother seeks to preserve the child's relationship with her own family while cutting off the child's relationship with her father and his family, and her conclusion that the father was more likely to facilitate a relationship between all the different players than the mother was.
The court has considered all of the testimony and exhibits entered at trial as well as the factors set forth in Connecticut General Statutes §§ 46b-56, also 46b-56a and 46b-84 and other relevant statutes. It is ordered that:
1. Custody
The parties shall have joint custody of the minor child, primary residence with the father. The mother shall be entitled to reasonable rights of visitation as follows:
 a. If the mother relocates out of state, the mother shall have six weeks of vacation during the summer months, beginning at the end of the school year and Christmas vacation week through New Years beginning on December 26th of each year. The parents shall alternate the Christmas Holiday, the child's spring and winter school vacation weeks and the Thanksgiving holiday and long weekend. The mother shall also be entitled to reasonable visitation with the child when she is in the area.
b. If the mother does not relocate out of state and resides in the child's school district or home town, the mother shall have alternating weekends CT Page 8304 and Wednesday overnights with the child. She shall also have four weeks with the child in the summertime. With respect to other holiday and vacation schedules, the parties shall alternate the major holidays as follows:
Even Years
 The mother shall have the child Christmas eve from 4:00 p.m. to 9:00 p.m., New Years eve from 5:00 p.m. until 7:00 p.m. on New Year's Day, Memorial Day Weekend from 5:00 p.m. Friday to 12:00 p.m. on Tuesday; Thanksgiving Day from 9:00 a.m. to 6:00 p.m.
 The father shall have the child Christmas eve from 9:00 p.m. through Christmas day at 6:00 p.m.; Easter weekend; Labor Day weekend and the July 4th holiday weekend.
 Odd years
The schedule is reversed
Every year
 The parents shall alternate the child's school vacation weeks other than summer vacation; they shall have the child on their own birthdays, the father shall have Father's day, the mother shall have Mother's Day.
Each of the parents shall continue to have a full and active role in providing a sound ethical, economic, and educational environment for the child. These powers shall not be exercised for the purpose of frustrating, denying, or controlling in any manner the social development of the child by the other parent. The parents shall exert their best efforts to work cooperatively to develop future plans for the child consistent with the best interests of the child and to amicably resolve such disputes as may arise from time to time. Each parent is entitled to reasonable telephone contact during the period when the child is with the other parent.
Recognizing the abiding need for the maintenance of a sense of dual parenthood for the benefit of the child and recognizing the deep and abiding love that each parent has for the child, the parties shall work together to maintain free, open and unhampered contact between the child CT Page 8305 and the parents. Each of the parties shall allow the child to maintain free access with the other parent when the child is in residence with them, and foster a feeling of affection between the child and the other parent. Neither parent shall do anything that will estrange the child from the other parent, which will injure the opinion of the child as to the other parent or which will impair the natural development of the child's love and respect for each of the parents.
2. Child Support
 Pursuant to the Connecticut Child Support Guidelines, the court orders that the mother pay $71.00 per week for the support of the minor child. This amount is based on the mother earning $320.00 per week. In the event that the mother relocates to the state of Florida or any other state where travel expenses for the child are substantial, and she is earning her asserted $35,000.00 per year, the court shall deviate from the child support guideline amount of $118.00 and order that child support shall be paid by the mother in the amount of $90.00. During the summer months when the child resides with the mother, no child support shall be payable.
3. Medical insurance and Unreimbursed Expenses
 Each parent is ordered to provide health insurance for the minor child as available through their place of employment and at reasonable cost to them. Should such not be available, the father shall apply for the HUSKY plan for the child . . . The parents shall each pay 50% of any copays and unreimbursed medical and dental expenses for the child.
4. Tax deduction
 The parties shall alternate the minor child as an income tax deduction. Husband shall have odd years, wife shall have even years.
Prestley, J.